Filed 7/25/13  P. v. Dacosta CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B240178 |
| Plaintiff and Respondent, | (Los Angeles County |
| v. | Super. Ct. No. LA063800) |
| TONYA DACOSTA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Thomas Rubinson, Judge.  Reversed.

James Koester, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, James William Bilderback II, Supervising Deputy Attorney General, Sonya Roth and Seth McCutcheon, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant Tonya Dacosta appeals from the judgment entered following a jury trial in which she was convicted of child abuse. Defendant contends the prosecutor engaged in prejudicial misconduct, and the trial court should have granted her motion for a mistrial. We agree that the prosecutor engaged in prejudicial misconduct when she introduced evidence the trial court had ordered excluded. Accordingly, we reverse.

## BACKGROUND

Defendant's 14-month-old son Ryan died at Kaiser Hospital on the morning of November 14, 2009, a little less than 24 hours after firefighters and paramedics first arrived at defendant's apartment in North Hollywood in response to a 911 call. (Date references pertain to 2009.) Defendant was in the street and appeared to be panicked and extremely emotional. She directed the firefighters and paramedics to her apartment. Firefighter Marvin Toledo testified that when he ran into the apartment, he saw a man, later identified as Ryan's father, Roger Shackelford, kneeling next to a baby, attempting to administer "rescue breathing." Shackleford stepped aside for the rescue team. Toledo testified that Ryan was not breathing, his pupils were dilated and fixed, he was pale or yellowish, and his stomach was bruised and appeared distended. Paramedic Kuniyuki Kasahara testified he saw two half-inch bruises on Ryan's abdomen. Paramedic Robert Barocas testified he overheard defendant say Ryan had been vomiting throughout the night. Toledo did not see any signs of vomiting in the apartment or on Ryan. Toledo scooped Ryan up and ran to the ambulance, which took Ryan to St. Joseph's Hospital.

Dr. Stephen Kishineff, who treated Ryan in the emergency room at St. Joseph's Hospital, testified that Ryan was dead on arrival, but hospital personnel were able to resuscitate him after 40 minutes. Kishineff saw tiny bruises on Ryan's chest and abdomen, but testified there were no bruises on Ryan's back or ear. Some of the injuries Kishineff saw on Ryan could have been "consistent with poor or improper respiratory efforts." A CAT scan revealed Ryan's brain was swollen, but not bleeding. Kishineff opined that Ryan's brain swelling was due to a very prolonged period of oxygen

2

deprivation. Brain swelling could also result from blunt force trauma, but it could not cause a skull fracture.

Ryan's health plan, Kaiser, transferred Ryan to its own hospital after about three hours. The physician on the team that transported Ryan testified she saw redness consistent with early-stage bruising on Ryan's upper abdomen, sternum, and mid-thoracic back. Dr. Johnny Luu treated Ryan in the pediatric intensive care unit when Ryan arrived at Kaiser Hospital on the morning of November 13. He noted one- to two-millimeter, semi-circular, "new" bruises on Ryan's abdomen, back, and one ear. These bruises grew larger over time. Dr. Luu opined that the bruises were caused by a fist. A CT scan revealed fluid outside Ryan's abdominal tract and raised concerns about abdominal bleeding. Dr. Raymond Parungao, a Kaiser physician who treated Ryan during the night, testified he also saw bruises on Ryan's back and behind both ears. Parungao testified that the bruises were mostly inconsistent with efforts to perform CPR, except the bruises on the back could have resulted from hard "smacks" on the back to attempt to dislodge an object obstructing breathing. Defendant remained with Ryan all night.

Luu testified that Ryan had been born at Kaiser Hospital and had been seen regularly for "well baby visits." A Kaiser pediatrician had seen Ryan on October 22 and noted no injuries. Physicians were required to report "signs of abuse" on a child, and Kaiser treated this requirement seriously. Luu further testified that children learning to walk often receive bruises, bumps, and cuts from falling down. Parungao testified that Kaiser records indicated prior reports of Ryan having difficulty keeping food down, and he had been given an appointment to see a specialist regarding that issue.

Notwithstanding the efforts of Kaiser personnel, Ryan died. Luu, who was present at Ryan's death, testified that defendant asked if she and Shackelford could hold Ryan for a while before his body was taken away.

Dr. Raffi Djabourian performed the autopsy upon Ryan. Djabourian opined that the cause of Ryan's death was bleeding in the abdomen, caused by blunt force trauma

3

and resulting in brain damage through insufficient blood flow to the brain. Djabourian testified Ryan had abrasions on both sides of his face, his left shoulder, and his chest. Ryan had a one-inch bruise and a one-quarter-inch bruise on his abdomen, a five-eighths-inch bruise on his chest, and a one-inch bruise on the upper rear portion of his left ear. Djabourian opined the bruises on Ryan's abdomen, back, and ear were caused by blunt force trauma, not by CPR attempts or falling down. The bruises on the abdomen and chest were acute, occurring less than three days before Ryan's death. The bruise on the ear was older, occurring three or four days before death.

Djabourian further testified that Ryan had two tears in his liver: an acute three-quarter-inch tear suffered within two or three days of death and a larger, deeper tear that was a couple of weeks or a month old. Ryan also had a one and-one-quarter-inch tear in his mesentery, a four-inch laceration of the rear peritoneal wall, and a corresponding injury to the jejunum portion of the small intestine. Djabourian opined these injuries occurred within two or three days before death. He further opined that all of these injuries were caused by blunt force trauma, and they could not have resulted from CPR, improperly performed CPR, falling, Ryan's throwing himself on the floor, or playing with a three-year-old child. Djabourian opined that a child Ryan's age with the same injuries to his liver would likely vomit and be lethargic and nauseous, but capable of some normal activities.

Djabourian further testified that Ryan had a three-inch, nondisplaced skull fracture and three bruises beneath his scalp, ranging from one inch to one and one-half inches in diameter. Djabourian opined that all of these injuries were caused by blunt force trauma. The skull fracture could have been asymptomatic. Ryan had no traumatic or hemorrhagic brain injuries.

Djabourian opined that the fatal injuries were inflicted within 24 hours of Ryan's death and would have resulted in death within one hour, absent resuscitative efforts.

Los Angeles Police Department detectives interviewed defendant seven times. Evidence regarding six of those interviews was introduced at trial. The first interview

4

occurred on the morning of November 13 at St. Joseph's Hospital, just as Ryan was about to be transported to Kaiser. An audio recording of this interview was played at trial. Defendant told Detective Anthony Washington that she, Shackelford, and Ryan lived at the apartment in North Hollywood. Only defendant and her mother took care of Ryan. Ryan had never been able to digest solid food and would vomit after eating. About four days earlier he was vomiting constantly, but after two days he stopped vomiting and was walking and playing and seemed fine. Defendant said Ryan had not fallen down or suffered any injuries within the last three days, but he had thrown himself on the floor in a temper tantrum two days earlier. Defendant said she and Ryan returned to the apartment from her mother's house about 2:00 a.m. that morning. Ryan appeared to be fine at that time. Defendant put him to bed in his crib and gave him a bottle of juice or Pediasure. Shackelford was already up when defendant arose around 7:00 a.m. Defendant walked by Ryan and noticed he was not breathing. Shackelford grabbed Ryan and began chest compressions.

Washington testified that he made numerous attempts to contact defendant and Shackelford between November 14 and November 16. On November 17, the police searched defendant's apartment pursuant to a warrant. They found no women's clothing and no items for a baby. Later that day, police found defendant and Shackelford in a motel in Gardena, registered under the name of defendant's sister, who was not present. A bag in the motel room contained $97,000 in cash.

Police detained defendant and interviewed her at the police station. A recording of this interview was played at trial. Defendant said she and Ryan were with her mother all day on November 12. Defendant and Ryan went to dinner with her friend Jamealia, then she and Ryan returned to her mother's house. She left Ryan there for about an hour while she went grocery shopping. When she returned, the house was dark and everyone was asleep, including defendant's three-year-old daughter Lexi, who lived with defendant's mother. Defendant slept until about 2:00 a.m., when Shackelford called her and told her to come home. Defendant picked up Ryan and drove to the North

5

Hollywood apartment. She put him to bed on the couch and gave him a bottle. The next morning, she noticed Ryan was not breathing and panicked because she did not know what to do to help him. Defendant denied seeing any bruises on Ryan, hitting him, or ever disciplining him. She also denied that Shackelford disciplined Ryan. She did not know who hurt Ryan, but thought it may have happened at her mother's house. She referred to her mother acting "crazy" and suggested the police talk to her mother. Defendant also said she sometimes left Ryan with her mother or grandmother.

The police released defendant at the conclusion of the interview and drove her back to the motel. Before they reached the motel, about 4:00 a.m. on the morning of November 18, they interviewed her again. Little evidence regarding this interview was presented, but apparently defendant told Washington she thought Shackelford may have killed Ryan and explained that as she was returning to the apartment after getting clothing from her car, she looked through the front window and saw Shackelford's arms swinging.

The fourth interview of defendant occurred on November 19 after the police phoned defendant and asked her to return to the police station. A surreptitiously recorded video of the interview was played at trial. Defendant told the detectives that Shackelford sometimes took care of Ryan when she was sleeping, and he also took Ryan with him to visit his family and friends. She had never seen Shackelford hit Ryan and did not believe he would do so. But on the morning of November 13, she went out to her car to get clothing. When she got back upstairs to the apartment, the door was locked and she could not get in. Through a gap at the edge of the blinds on the front window, defendant saw Shackelford's arms moving near the area of the couch where Ryan was lying and heard three soft "bangs," as if something were being hit against the couch. She knocked on the door and after a slight delay, Shackelford opened it, carrying Ryan against his chest. Defendant asked what was going on, and Shackelford told her to just get ready. Shackelford put Ryan down on the bed and defendant went toward Ryan. Shackelford said, "Leave him. He's fine. Just finish getting ready." Defendant spent about 10

6

minutes getting ready, then noticed and exclaimed that Ryan was not breathing. Shackelford began pushing on Ryan's chest to try to make him breathe, and defendant phoned 911. Defendant again told the detectives that she did not hit or otherwise discipline her children. Defendant did not see any bruises on Ryan before he went to the hospital. She saw bruises on him at the hospital, but thought they were caused by the chest compressions used during CPR. She did not see a bruise on Ryan's ear and she never pulled on his ear, but there was a time when the color of Ryan's ears had changed.

Defendant's fifth interview occurred on November 23 when Washington phoned defendant. A recording of that interview was played at trial and is the subject of the issues raised in this appeal. Defendant asked Washington about releasing the seized money so that she could pay the mortuary that had Ryan's body. As further described later in this opinion, Washington then asked defendant how her daughter Lexi broke her "ankles."

The sixth interview of defendant occurred on December 9, after defendant's arrest. It was recorded on video, but the recording was not played at trial. Detective Washington was present, but Detective Cathy Luke, who was present for most of the interview, testified regarding defendant's statements. Defendant again told the detectives that she was not able to open the door to the apartment after she returned from her car, she saw arms moving, and heard a sound like something hitting the sofa. When Shackelford opened the door to let defendant in, he immediately took Ryan into the bathroom and began bathing him. Defendant tried to go into the bathroom, but Shackelford repeatedly told her to get out. Defendant expressed concern because Shackelford poured a lot of water over Ryan's head. Shackelford said Ryan was fine and told defendant to get dressed. As she was getting dressed, Shackelford brought Ryan into the bedroom and threw him on the bed. Defendant told Shackelford not to play so roughly with Ryan. Shackelford often played roughly with Ryan, and Ryan did not like it. Luke testified that she had heard from other detectives that defendant had told them about the bathing sometime before December 9. Defendant repeatedly stated that, although the police

7

insisted she knew what happened to Ryan, she actually did not know and was trying to figure it out. She thought that Ryan must have been injured either at her mother's house the night of November 12 or when she went out to her car on the morning of November 13. Defendant also said Shackelford was applying pressure to Ryan's midsection when he attempted to perform CPR on him, and defendant thought that might have caused Ryan's injuries. Defendant reiterated that Shackelford never hit Ryan. She remembered that three to seven days before he went to the hospital, Ryan had fallen on his face and had scratches, a lip wound, and a mark on his ear. She also stated that Ryan's ears had been different colors when he was born and they kept changing color.

Shackelford's mother, Romaine Robinson, testified that she believed defendant and Ryan lived with defendant's mother, not with Shackelford. Robinson testified she saw Ryan once or twice a week for his entire life. Whenever she wanted to see Ryan, she would call defendant and defendant would bring Ryan to visit her. Defendant never refused any request by Robinson to bring Ryan to see her. From the time Ryan began trying to walk, he frequently had bumps and bruises on the back and the sides of his head. The bumps looked like the kind a child would get from hitting his head on a table corner. When Robinson would ask defendant what had happened to Ryan, defendant would say that Lexi had pushed Ryan or Ryan had fallen off the bed. Once, Ryan had a large bruise on his back. Defendant told Robinson she did not know how he received it. Robinson described Ryan as a sad child who did not play or laugh. He was always vomiting and only wanted his mother to hold him. Robinson admitted on cross-examination that Ryan was smiling in several photographs introduced by the prosecution. Robinson saw Ryan three days before his hospitalization when she and defendant went to a karaoke bar. Robinson did not see any bruises on Ryan that day. Robinson and defendant left Ryan with Robinson's friends in West Covina while they went to the bar. Ryan was projectile vomiting at that time. When they returned from the karaoke bar they were having drinks with Robinson's friends. Ryan spilled defendant's drink and she became angry and said, "Get away from me."

8

Robinson testified she went to Kaiser Hospital after she heard that Ryan had been taken there. She stayed at his bedside off and on through the night and until he died. She denied that defendant was with Ryan when he died, but testified that defendant pulled a sheet over Ryan's head after the medical staff had stopped working on Ryan, before they pronounced him dead. Robinson denied that Dr. Luu was the physician who was taking care of Ryan when he died and insisted there was a female physician caring for Ryan at that time. Robinson testified that only she and Shackelford held Ryan after he died, and she denied that defendant held Ryan. Defendant did not appear to be upset when Ryan died, but later she faked being upset by pounding on the floor and screaming, "My baby, my baby." The hospital staff prepared a keepsake box and attempted to give it to defendant, but she said she did not want it, so Robinson took it.

Robinson testified that defendant did not seem to be in mourning because she went out "clubbing" and shopping. Robinson testified that defendant went clubbing around Christmas of 2009, but then agreed defendant was in custody from December 9. Robinson was aware that defendant tried to raise money for Ryan's funeral. Robinson visited defendant in jail before their relationship soured, but she could not remember when. In February or March of 2010, Robinson learned that defendant was blaming Shackelford for Ryan's death. Robinson denied that Shackelford ever took care of any of his children when they were young. She initially testified Shackelford had five children, including Ryan, and later testified he had three children other than Ryan. She testified "[a]t least five" of his girlfriends were pregnant at the same time defendant was. Robinson further testified that Ryan had a birthmark, but she could not recall where it was.

Robinson admitted she had been convicted of welfare fraud, but denied that it was a felony. The prosecutor told defense counsel and the court, outside the presence of the jury, that records indicated the conviction was a felony, but Robinson had told her it was reduced to a misdemeanor. In the presence of the jury Robinson insisted the offense was always a misdemeanor and denied telling the prosecutor it had been reduced to a

9

misdemeanor. She further admitted that she had "mental health issues" and was taking psychotropic medications. She had also had two strokes during Ryan's life.

Defendant's grandmother, Virginia Hyde, testified that she saw defendant and Ryan almost every day. Defendant would leave Ryan with Hyde when she went to work, Mondays through Fridays, except for about one month around September 2009, when defendant was sick and not working. When defendant recovered and went back to work, she resumed leaving Ryan in Hyde's care while she worked. On one occasion, Shackelford picked up Ryan from Hyde's house by himself. Hyde never saw defendant abuse Ryan, and she never saw any injuries on Ryan except one he received at Hyde's house before he was able to walk. He was trying to pull himself up using her coffee table and bumped his head on it, causing a small bump on his forehead. Hyde had forgotten about that incident when the prosecutor interviewed her. Ryan was a happy, active, but quiet child. He smiled a lot and loved to dance to loud music. But he could not eat solid food and would sometimes vomit. Three days before Ryan went into the hospital Hyde asked defendant to take her shopping. They cut the shopping trip short because Ryan was sleepy. Hyde did not see any bruises on Ryan that day.

Pamela Bell, a friend of defendant's mother, testified that she saw Ryan with defendant twice before Ryan began walking. Bell never saw any injuries on Ryan and never saw defendant mistreat him. Ryan was a happy baby who laughed and played.

Although Washington did not interview Hyde during his investigation, he testified in rebuttal that he was present with counsel for an interview during trial. At that interview, Hyde did not mention Ryan hitting his head on her coffee table.

The jury convicted defendant of child abuse in violation of Penal Code section 273a, subdivision (a). The jury found not true an allegation that defendant had "under circumstances or conditions likely to produce great bodily harm or death, willfully cause[d] or permit[ted] any child to suffer, or inflict[ed] thereon unjustifiable physical pain or injury that results in death, or having the care or custody of any child, under circumstances likely to produce great bodily harm or death, willfully cause[d] or

10

permit[ted] that child to be injured or harmed, and that injury or harm result[ed] in death." (Pen. Code, § 12022.95.) The trial court denied defendant's motion for a new trial and sentenced defendant to six years in prison.

## DISCUSSION

Defendant contends that the prosecutor, Nancy Yaghoubian, committed prejudicial misconduct by violating the trial court's order to redact recordings and transcripts to eliminate all references to defendant's daughter Lexi suffering two fractures to the same ankle, two weeks apart. She argues the misconduct violated due process and the trial court should have granted her motion for a mistrial based on the misconduct.

Before trial, Yaghoubian filed a motion seeking to introduce evidence of "prior acts of child abuse at the hand of defendant against her daughter, Lexi." Yaghoubian explained Lexi had suffered "two separate broken ankles for which she sought medical attention for [*sic*], five months prior to this child's death. After the second broken ankle the hospital personnel got suspicious, called DCFS." Yaghoubian continued, "[S]ocial workers interviewed the defendant several different times, and the defendant gave, by my last count, four or five different explanations as to how her daughter sustained these injuries." Upon questioning by the court, Yaghoubian revealed that the DCFS investigation "found that there was no abuse" and the agency closed the case. Yaghoubian also revealed that Lexi "never lived with the defendant. She was living with the defendant's mother for six months prior to that."

Defense counsel objected, noting there was no finding of abuse, defendant was not present when Lexi suffered her injuries, defendant's statements were based upon what others told her had happened to cause the injuries, and her statements were not actually inconsistent. Counsel argued the court should exclude the evidence as "more prejudicial than probative." After much additional argument, the trial court denied Yaghoubian's motion, noting that Yaghoubian had no evidence of prior acts of child abuse by defendant. The court further explained there had been no showing defendant was either present or in any way responsible for Lexi's injuries. It continued, "And under those

11

circumstances, when you're talking about a defendant who's being tried for the crime of child abuse likely to produce GBI or death, and you want to bring in prior evidence of—or evidence of prior child abuse, that is very, very powerful evidence, and I just don't see it as—I just don't think you can link the prior injuries to this defendant, like I said, in any kind of meaningful way. [¶] And it is highly prejudicial evidence. That's not to say it wouldn't be probative, as well, but the prejudicial effect of this type of evidence is very, very substantial, and in this particular case I think it's substantially more prejudicial than probative, and pursuant to [Evidence Code section] 352 it's not going to be admitted in this trial."

On the fourth day of testimony, Yaghoubian argued that the court should reconsider its exclusion of the evidence regarding Lexi's injuries. The court did not change its ruling.

Before Yaghoubian played the recording of Washington's fifth interview with defendant, defense counsel asked, outside the presence of the jury, to "make sure that these have been redacted and you've gone through and taken out anything objectionable." Yaghoubian responded, "Well, what do you find objectionable in these?" Defense counsel replied, "The stuff that's been ruled out. Anything that you would know would not be generally admissible based upon the facts." Yaghoubian did not respond to the inquiry about redaction, but instead asked defense counsel if he knew "which call this is," then stated it was Washington's phone call to get information regarding Jamiela [*sic*] and Claudia, which included an "exchange about, 'Where's my money?'"

Yaghoubian began playing the recording, which was not reported by court reporter, then stopped it before it ended and asked to approach. The court stated, "I think that concludes the relevant parts of the call." Yaghoubian asked to "retrieve the transcripts," and the court replied, "Yes, please." Jurors had been allowed to keep their individual copies of the transcripts of other recordings played during the trial.

In the course of the subsequent discussion between the court and counsel outside the jury's presence, the court noted that the recording was stopped at a point

12

corresponding to page 11 of the transcript. Yaghoubian later asserted, without contradiction by the court or defense counsel, that she stopped the recording at a point corresponding to line 21 or 22 on page 11 of the transcript. Using line 22 as the end point, the jury would have heard the following regarding Lexi:

"Detective Washington: Briefly, could you just tell me before I let you go, 'cause it's just part of the thing that I have to do to finish what I'm doing is [*sic*]. How Lexi hurt her ankles—or what was actually hurt on Lexi?

"[Defendant]: It was—it was broke. Well, fractured.

"Detective Washington: What was broke?

"[Defendant]: It wasn't broke, it was fractured.

"Detective Washington: Okay. What was fractured?

"[Defendant]: Just her ankle.

"Detective Washington: Her ankle. Just one or two?

"[Defendant]: One.

"Detective Washington: Only one. You never"

If jurors continued to read the remaining three lines of page 11 before Yaghoubian collected their transcripts, they would have seen Washington's completed question: "You never went to the hospital twice for two different ankle fractures?" and the beginning of defendant's response: "Yeah. Yes. Yeah, went twice."

After Yaghoubian stopped the recording and collected the transcripts, she asked Washington a few more questions, then the court sent the jury out for a break and addressed counsel: "I'm really not happy with what just happened here. And the record should reflect, because it wasn't being transcribed, but this tape and transcript were not properly redacted. References to Lexi, Lexi's ankles, Lexi's ankles being hurt, Lexi's ankles being broken and fractured remained on this tape—or this CD and on this transcript after the court not only made a specific ruling that they be removed from this trial, but [defense counsel] asked to go to side-bar to confirm that nothing like this was going to be in here. And there it is. And it's in here over multiple pages. [¶] Miss

13

Yaghoubian stopped the recording, stopped the jury from hearing more of the recording and doing further damage, but as I'm looking at this transcript, it goes on for three, four, five pages about the broken ankle and how it happened and—broken ankles. [¶] I just don't understand how this happened, and I'm very concerned about it."

Yaghoubian apologized and denied that the failure to redact was intentional, citing long hours she and detectives spent redacting recordings and transcripts. She then argued that "there's no death knell of anything that's wrong here." The court asked, "How do you unring the bell?" Yaghoubian responded that evidence about Lexi's broken ankles was going to be admitted anyway because the defense was going to present character witnesses.

Defense counsel moved for a mistrial and noted that he "had no intention of doing anything to open the door about Lexi because it's so damaging that I wanted it out." Defense counsel continued, "You should have seen—I don't know if the court watched the jurors' faces when they heard that. There's no way that the defendant can have a fair trial at this point with this in it."

The court stated, "It doesn't matter whether it was intentional or not. I don't think it was intentional. But damage has certainly been done here. Significant damage." After interruption by Yaghoubian, the court continued, "The whole point of that [Evidence Code section] 402 and the ruling that I made was to keep exactly this from happening, keeping the jury from hearing exactly this because of the prejudicial effect that it has." After further interruption, the court continued, "I did not look at the reaction that the jury was having specifically because I didn't want the jury to think that I thought that 'Oh, my God,' a moment had just happened, and I tried to play it off as if no big deal. 'Stop the tape. Okay. Let's just collect the transcripts now and move on.' So I don't know what their reaction was."

Yaghoubian argued there was really no damage from the portion the jury heard because the detective had not accused defendant of breaking Lexi's ankles. The court responded, "The damage is and can be when you've got a mother sitting here on trial for

14

either abusing or permitting her child to be abused and killed and the defense is, 'I didn't do anything, and I didn't know about . . . anybody else doing anything either,' and you've got evidence that she has another child who came up with, shall we say, an unusual set of injuries not very long before this child died. [¶] You cannot tell me that isn't something that a jury is going to utilize. That is human nature. And where there is smoke, there's fire; that sort of thing. And that's specifically why the evidence is so prejudicial that it led me to make the [Evidence Code section] 352 ruling that I did. The only reason—but that's also why the evidence is so probative. Were the People able to tie it to the defendant, it would have been devastating evidence against her."

After the court and defense counsel discussed the possibility that the jury had read ahead in the transcript, Yaghoubian again argued that the jury had heard very little information compared to what Yaghoubian had wanted to admit, and jurors would not make "the leap" that the court feared. The court stated, "Counterbalancing that is the very fact that the tape had to be stopped in the middle, the transcripts had to be collected. It was obvious something was going on here." Yaghoubian replied, "Well, it's been obvious throughout the whole trial." The court responded, "No, it hasn't. Not to the jury it hasn't. That information about Lexi was being removed from their consideration, that has not been obvious to the jury. Now it is."

The court nevertheless denied the mistrial motion and decided to admonish the jury, over defendant's objections. When the jury returned from a break, the court stated, "Ladies and gentlemen, the recording of the phone call and the transcript that you were following along with, it was starting to get into some information about the defendant's daughter, Lexi, having suffered a broken ankle at some point in the past. That evidence is something that I had ordered to be—it's not even evidence—that I had ordered to be taken out of the recording and the transcript. That was not done. I don't think it was intentional. It may have been inadvertent. But, nevertheless, it was left in there by mistake. [¶] What I want you to know is that the reason that I was removing it from this case is because there's never been any finding, any evidence or anything like that to show

15

that [defendant] had anything to do with her daughter breaking her ankle. There's never been anything to suggest that this was anything other than a normal childhood accident, and that's why I didn't want it to come before you, because I didn't want anybody to make any inference that, 'Oh, she had a child who broke an ankle. Now she's had a child who died.' [¶] It has no relevance because there's nothing to suggest that she had anything to do with the broken ankle. Those of you who have had children know sometimes children get hurt and it's nobody's fault. And that's the situation with the ankle. [¶] So that's why we had Miss Yaghoubian stop the recording and take the transcripts from you. I didn't want anybody to be considering the ankle situation with Lexi for any purpose. It's not part of this trial. It's not relevant to anything in this trial. And I don't want you to consider it for any purpose." The court asked jurors if anyone had any questions, then noted there were no questions. It asked, "Everybody's real clear on that?" then noted there were "[h]eads nodding up and down."

Defense counsel asked for a sidebar conference, where he noted that a specified juror "was basically rolling her eyes during the court's speech and smirking." The court stated it did not see that, but saw the same juror "sort of smirk and smile when I said, 'Those of you who have children know that sometimes children just get injured.'" Defense counsel stated, "It started way before that." The court said it had not seen that portion.

Defense counsel renewed his mistrial motion at the start of the next day of trial, noting that Yaghoubian committed "two misconduct violations yesterday. One was the fact that these things were not redacted when the court had made its ruling. Then there was a second one because I called her up with the court, and she told the court and myself that they had been redacted." After argument by counsel, the court stated it had "thought about it a lot overnight, and it seems to me that the impact of what the jury saw on the transcript through page 11 and what they heard on the tape and saw on the tape [*sic*] is not very significant. [¶] What the jury knows is that Lexi at some point in her life had a broken ankle. They don't know when it was. They don't know that there was a DCFS

16

investigation. They don't know what any of the circumstances were other than what I told them, which is there's no evidence that the defendant had any involvement in this and that this was anything other than an accident like many, many children have. That's all they know. [¶] They don't know—most of what I excluded they still don't know. The investigation. Her conflicting—or what one could interpret to be conflicting statements about it. They don't know any of that. Those are the aspects of this that were, frankly, the most prejudicial or potentially prejudicial, which is what motivated me to make the ruling that I did on [Evidence Code section] 352 grounds. Most of what I excluded this jury still has not heard and will not hear. What they did hear, to me, is relatively minor, nonprejudicial and not sufficient to affect the fairness of the trial." The court further stated that it believed its admonition cured any potential prejudice and denied the renewed motion for mistrial.

A prosecutor's misconduct violates due process if it infects a trial with unfairness. (*People v. Harrison* (2005) 35 Cal.4th 208, 242.) Less egregious conduct by a prosecutor may nonetheless constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to attempt to persuade the court or jury. (*Ibid.*) "It is misconduct for a prosecutor to violate a court ruling by eliciting or attempting to elicit inadmissible evidence in violation of a court order. [Citation.] . . . Because we consider the effect of the prosecutor's action on the defendant, a determination of bad faith or wrongful intent by the prosecutor is not required for a finding of prosecutorial misconduct." (*People v. Crew* (2003) 31 Cal.4th 822, 839.)

Given the simple, sparse text of the unredacted transcript, the apparently abrupt halt to playing the recording, and the close proximity to the end of page 11 when the playing of the recording stopped, it is reasonably probable, that at least some jurors read ahead to the end of page 11. In this regard we note that the trial court seemingly reached the same conclusion. In denying the renewed motion for mistrial, the court referred to "the impact of what the jury saw on the transcript through page 11," and it later stated, "I know they read through page 11. I don't know that they read a single word, any of them,

17

beyond that." Accordingly, we consider the improperly admitted statements to include all of page 11.

The evidence Yaghoubian improperly introduced in violation of the trial court's order excluding it was extremely prejudicial. As the trial court noted, "The damage is and can be when you've got a mother sitting here on trial for either abusing or permitting her child to be abused and killed and the defense is, 'I didn't do anything, and I didn't know about . . . anybody else doing anything either,' and you've got evidence that she has another child who came up with, shall we say, an unusual set of injuries not very long before this child died. [¶] You cannot tell me that isn't something that a jury is going to utilize. That is human nature. And where there is smoke, there's fire; that sort of thing. And that's specifically why the evidence is so prejudicial that it led me to make the [Evidence Code section] 352 ruling that I did." We note, in addition, Detective Washington's knowledge of Lexi's injuries and his inquiry to defendant about them implied there was enough suspicion about the way they occurred that at some time someone had reported it to law enforcement and Washington felt it had potential relevance to his investigation of Ryan's death.

Not only did the improperly admitted statements permit the jury to infer that defendant harmed Lexi, allowed someone else to do so, or knew that someone to whom she had entrusted Lexi had harmed her, it improperly allowed the jury to infer that defendant lied to Washington to attempt to minimize her culpability regarding Lexi's injuries. Defendant told Washington that Lexi broke only one ankle; Washington had referred to "ankles" and responded to defendant's assertion that Lexi broke only one ankle by repeating "[h]er ankle" and asking, "Just one or two?" After defendant reiterated it was one ankle, Washington got her to admit that she "went to the hospital twice for two different ankle fractures." Because the jury never learned that Lexi broke the same ankle twice, this portion of the questioning supported a strong, but erroneous inference that defendant was lying to Washington and minimizing what had happened with Lexi's "ankles." This strengthened Yaghoubian's arguments to the jury that

18

defendant had minimized her own culpability regarding the injuries that led to Ryan's death throughout her numerous statements to the police. Indeed, the statements about Lexi's "ankles" provided a powerful, seemingly objectively confirmed instance of defendant minimizing the injuries to Lexi in one of those police statements.

Under the circumstances, Yaghoubian's improper introduction of the highly prejudicial testimony the trial court had ordered excluded portrayed defendant as a liar and someone with a history of significant, suspicious injuries to her young children. Given the erroneous nature of the inference that defendant was lying to Washington about Lexi's "ankles" and the absence of any facts showing defendant was in any way responsible for Lexi's broken ankle, Yaghoubian's improper introduction of this evidence infected defendant's trial with such unfairness as to violate due process. Accordingly, the Attorney General has the burden of proving beyond a reasonable doubt that the improper introduction of this evidence did not contribute to the verdict. (*Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824].)

The Attorney General argues that "the trial court's admonition was more than sufficient to cure any prejudice." Given the multiple, severely damaging aspects of the improperly introduced evidence, it is unlikely that any admonition could have cured the prejudice to defendant. But even if that prejudice were potentially remediable, the admonition actually given by the trial court was insufficient. It addressed, at best, only the possibility that defendant directly caused Lexi's broken ankles and did not address the possibility that defendant caused or willfully permitted Lexi to be placed in a situation where she was endangered, which paralleled the prosecution's theory and jury instructions regarding the injuries to Ryan. In addition, the court's statements ("there's never been any finding, any evidence or anything like that to show that [defendant] had anything to do with her daughter breaking her ankle. There's never been anything to suggest that this was anything other than a normal childhood accident") did not actually inform the jury that defendant was not responsible in any way for Lexi's broken ankle, just that there was no evidence establishing her responsibility. And the jury could

19

reasonably infer from Detective Washington's knowledge of Lexi's injuries and his inquiry to defendant about them that Lexi's injuries were suspicious, not just "a normal childhood accident." Thus, the admonition could not dispel the extremely powerful prejudicial inferences recognized by the court, the prejudicial inference inherent in Washington's knowledge of the injuries and inquiry about them, the extremely powerful prejudicial inference inherent in a child having *two* separate ankle fractures, or the extremely prejudicial but erroneous inference that defendant had lied to Washington to minimize her culpability for Lexi's injuries. Indeed, the jury could infer from the court's admonition that defendant got away with harming Lexi or permitting her to be harmed.

The improperly admitted evidence was extremely inflammatory in the circumstances of this case, where there was no direct evidence and only weak circumstantial evidence that defendant had either inflicted the injuries on Ryan or knowingly permitted him to be placed in a situation where his body or health was endangered; the significant injuries were either so recent that they may have been inflicted just before Ryan stopped breathing or they were undetectable (skull fracture, older liver tear) and had not been detected by Ryan's pediatrician when he saw Ryan during an October 22 appointment. Although Robinson testified that she frequently saw bruises and bumps on Ryan, her credibility was subject to significant doubt, given her welfare fraud conviction; her admitted "mental health issues" and use of psychotropic drugs; her apparent memory impairment from two strokes; her obvious bias in favor or her son, Shackelford, upon whom defendant cast blame; and apparent falsities in her testimony, such as her insistence that Dr. Luu was not attending Ryan when he died, that only Robinson and Shackelford held Ryan after he died, and that defendant was out "clubbing" around Christmas, when in fact she was in jail. Under these circumstances, it is highly improbable that, notwithstanding the admonition, every juror completely disregarded and remained uninfluenced by hearing about Lexi's "ankles" being broken, and defendant's seemingly lying about whether both of Lexi's ankles were broken.

20

Accordingly, we cannot conclude beyond a reasonable doubt that Yaghoubian's misconduct did not contribute to the verdict. Reversal is thus required.

We note that the fairness of defendant's trial was further impaired by several other errors. The trial court allowed Robinson to testify, over defendant's hearsay objection and motion to strike, that after Ryan's death defendant's mother said, "'It's going to all come out. It's going to all come out how she is, what she did.'" When the trial resumed four days later, the court told counsel it realized it erred, then informed the jury of its error, sustained the objection, and struck the testimony.

In addition, Yaghoubian argued several matters not supported by the record, although defendant failed to object in the trial court and thus forfeited the errors for appellate purposes. For example, she argued, based on testimony by Washington that was stricken for lack of personal knowledge and as based upon hearsay, that defendant lied about her apartment door locking and being delaying in getting back inside: "She gives them the story that doesn't check out with the self-locking door. The detectives were there. They never found such a door." Yaghoubian also argued, based upon embellishment of testimony that was stricken for lack of foundation, that the $97,000 in the motel room was "in a diaper bag of a dead baby." This was not merely a minor detail, but one carrying a heavy emotional charge and portraying defendant as callous. Yaghoubian also argued, without support in the record, that defendant "treated [Ryan] like a purse and took him as an accessory to get the attention of [Shackelford]."

Defendant objected, to no avail, when Yaghoubian misstated Hyde's testimony to support her argument that Ryan was in defendant's care and defendant "ran out of people to blame" for his injuries: "Think back to the testimony of [defendant's] grandmother, and what she was able to tell us is that she used to take care of him, [defendant] stopped working and then [defendant] had the baby. She no longer brought it to [Hyde's] house."

Finally, we note that Yaghoubian was on notice of inadequate redaction of the recordings and transcripts before she played the recording of Washington's fifth interview with defendant. After Yaghoubian played the DVD of Washington's fourth

interview with defendant, defense counsel noted on the record that the recording contained a reference to Shackelford being in jail and on probation, even though the court had granted Yaghoubian's motion to exclude evidence of his criminal history.

## DISPOSITION

The judgment is reversed. Pursuant to Business and Professions Code section 6086.7, subdivision (a)(2), the clerk of this court is directed to send a certified copy of this opinion to the State Bar.

NOT TO BE PUBLISHED.

MALLANO, P. J.

We concur:

ROTHSCHILD, J.

JOHNSON, J.